v. Kahn. I don't want to butcher the names, so I'm not sure. All right, sir. Good morning. May it please the Court? My name is Matthew Probus, and I'm here representing the appellant Stephen K. Kahn. And this case presents the interesting question of the intersection of the Texas Construction Trust Fund Act with Section 523 of the Bankruptcy Code. And in particular, this case involves the question of whether or not the Bullock v. Bank Champaign case that was decided by the Supreme Court in 2013 has effectively restricted the reach of what could constitute a defalcation while acting in a fiduciary capacity under Section 523A4. Under Section 523A4, the Bankruptcy Court is the purveyor of what constitutes a nondischargeable debt. So even if a plaintiff is able to establish a violation of the Texas Construction Trust Fund Act, it's up to the Bankruptcy Court to determine whether or not there was a true defalcation while acting in a fiduciary capacity. This Court has wrestled in the past with what the fiduciary capacity is that could be created under the Texas Construction Trust Fund Act because the Act does not create a true express trust. This is not a trust. It's a technical trust that's a statutory trust. And the Court, this Court has determined that you cannot have a statutory trust that creates an applicable trust that is prior to, the Act has to create the fiduciary capacity and the fiduciary obligations prior to the and independent of the wrongful act. The Texas Trust Fund Act creates a violation when the trustee of the funds, which is the builder in this case, Mr. Hand, takes funds in and uses, disperses, pays those funds out with either knowingly, intentionally, or with an intent to disperse the funds. And the trustee of the funds is the one that pays them out prior to paying all of the contracts, subcontractors, or expenses related to the project. So is there anything in the Act itself, or in any of the cases that talk about the statute that dispositively state that there's a fiduciary obligation? What can we look to to hang our hat on that with certainty? I take it there's nothing in the Act itself that uses that word because we didn't find any and none were cited in the briefs. That's correct. Where do we go to get that heightened duty? And I don't think, I think the appellate's position is that it just doesn't exist. And in fact, this Court's opinions in Angell, through Boyle, and then on into Nicholas post-1987 when the Act was actually broadened into Tran, which is actually a case that Judge Wiener wrote for the Court under the Texas Lottery Act. And I think just Judge Wiener's opinion in Tran is very instructive because it points out the fact, and Judge Wiener looked at Boyle and at Nicholas, and he points out the fact, which all of the cases out of this Court have pointed out, that there's no duty to segregate the funds, that the funds can be used on other projects, that I think Boyle says there's no red, blue, or yellow requirement under the funds that are taken in by the builder. In other words, the builder doesn't have to take Project A's funds and apply them to the expenses of Project A, take Project B's funds and apply them to Project B, and so what you have is there's a requirement to create a construction account, which in this case Mr. Hand had, and there's a requirement that you have recordkeeping to keep records of what expenses, what money does come in, and what funds go out. But the funds are all commingled. And so, and that's exactly what happened in this case, is that all of the projects that Mr. Hand had were commingled into one bank account for the company SKH 2000. And there's nothing in the Act that creates the express trust type of obligations that a fiduciary capacity would require. Well, but that begs the question under the facts of this case, as I understand it, is there latitude for your client to spend money on the debts of a prior business? I thought there was something in here about Hand Builders Limited, or any other personal debts outside of the corporate entity, the construction company that he's operating. I think that's where we look to Bullock, really, because Bullock actually involved an express trust, a true trust that was established by a father's death for the sons, and one of the sons was the trustee of the trust, and he made loans, personal loans, to himself and to his mother to use in personal business ventures. Ultimately, the funds were repaid, but the court in Bullock says that that's not the type of wrongful conduct that constitutes defalcation for purposes of Section 523. And so in this case, even though Mr. Hand, the findings were that he did take payments out of the construction account and make payments to his own expenses and to his other company's expenses, but that's not the type of wrongful conduct that's now required under the Bullock case. And so I think that when you get, and it also leads us to the next point, really, which is this commingling point. In order to show any violation of the Texas Construction Trust Fund Act, you have to show that the funds, the trust fund of this project, were the ones that were used prior to the payment of the construction funds on that project. In this case, the funds that show that this money that Mr. Kakashani paid into this construction account that was commingled were, in fact, the ones that Mr. Hand used to make his payments of his personal expenses. In fact, there is a subsidiary finding that the arbitrator makes in the award that Mr. Hand actually got loans from other people and brought them into his own account. There was a $100,000 loan and there was a $200,000 loan. And so it's quite possible without any subsidiary findings in the arbitrator's award to benefit the bankruptcy court or the district court on this motion for summary judgment that, in fact, Mr. Hand used the funds from those loans to make his personal payments. And then there were other projects. It's quite possible that the other projects were paid from the Kakashani funds that came in and that Mr. Hand took those funds and paid them out on other projects, which the Texas Construction Act says is appropriate. You don't have to follow the red, blue, and yellow rules. You can take funds from one purchaser, one customer, and apply them to project expenses of another project. And so there's absolutely no tracing that was done that we can see in the arbitration award. Interestingly, this court in In Re Swore, which I believe is a 2009 case, it was pre-bullet, Judge Jones wrote for the court, and in fact at the end of her opinion she says, there's no evidence of tracing here. And so we don't know if the person, if the funds of the one project were actually the funds that were used to make the loan repayments. And in Swore that was a case, again, where the principals of the corporation had taken repayments out of the corporation for personal loans that they had made in. Judge Jones held that in fact those weren't loans, it was capital contributions. And she went further and said a withdrawal of a distribution on a capital contribution is not a project expense. But she ultimately said, but I still can't tell if there's even a violation of the Texas Act here, because there's no tracing that's been done. And so she remanded the case for further proceedings. And, counsel, let me ask you, and this may be going in a different direction than what you've argued up to this point, but as I understand in the record, the case was sent to arbitration for fact-finding and some recommendations, and then the bankruptcy court not only considered those facts, but also an affidavit, which to me are, are evidentiary facts in that form. It's testimony that's not before the arbitrator. So under what authority did the bankruptcy court, was there something that allowed it to supplement what the arbitrator returned? Is there some provision or was there some agreement that allowed it? Well, so the, there was no agreement that allowed it, but the court and the United States Supreme Court in, in cases that kind of work hand-in-hand have said that, first of all, it's the McDonnell versus the City of West Michigan case that says that an arbitrator does not have to accept all of the findings of an unappealed arbitration award. And so she didn't have to follow all of the findings made by the arbitrator. But I believe it's this court's opinion in In Re Posted that says that the bankruptcy court can accept additional testimony or additional evidence in order to determine the character of the debt so that the bankruptcy court can make the determination of whether or not the debt is non-dischargeable under Section 523. And that's what Judge Brown, the bankruptcy judge in this case, did. And so I, I think that that, I think that was appropriate for her to do. This, to get back to the, the defalcation, I believe that there, what Bullock has essentially done is not only limit what, what, what a, what violations can in fact constitute a non-dischargeable debt under 523A4, but in fact, the Texas Constructing Act says that it defines an intent to defraud as an intent to divert the funds. And then it, in the subsequent section, that's in Section 162.05, under the definition of an intent to defraud. Then it goes to Section 162.031 and says what is a misapplication of the funds. And in the misapplication of the funds, which is really where you get the violation, it says that any diversion, any use, payment, or, or retain of the funds of the project with knowledge, knowingly, intentionally, or with an intent to defraud. And so even though this court in Nicholas held that once the court broadened, once, I'm sorry, once the legislature broadened Section 162.03 to include just a knowing or intentional diversion, I think under Bullock v. Bank Champaign, it's now clear that, that it requires a wrongful conduct, an intent to defraud diversion in order to have a defalcation for purposes of Section 523. And I don't think that that's here. And I think that what this court probably may be struggling with is the fact that Mr. Kakashani made the tactical decision to go to the arbitration. The parties agreed to the arbitration and agreed that the facts would be determined by the arbitrator. But the bankruptcy judge, and it is in the record that the bankruptcy judge made sure they understood that they would have to return to the bankruptcy court for the determination of whether or not it's non-dischargeable under Section 523. When Mr. Kakashani returned to the bankruptcy court, instead of going to trial and trying the case to the bench and bringing all of the evidence that was submitted to the arbitrator into play, he filed a motion for summary judgment. And in fact, on his motion for summary judgment, he could have attached all of the exhibits and the transcript of the testimony in the arbitration to the motion for summary judgment and at least created some type of a fact issue or had some subsidiary findings or some subsidiary evidence to reflect the wrongful intent that would make it a falcation under the wrongful intent standard of Bullock. He didn't do that. All he did was come back to the bankruptcy court on a motion for summary judgment and he attached only the findings. And that, to your point, Judge Engelhardt, gets to the importance, I think, of the cross motion for summary judgment that Mr. Hand filed, where he did attach an affidavit going to his scienter, going to his intent, and saying that he never intended to deceive, he never intended to take the money. And so the bankruptcy court can consider that as summary judgment evidence. When either the bankruptcy court or the district court is looking at the summary judgment record as opposed to just the overall record on appeal before this court, the summary judgment record only consists of the arbitration award and of the affidavit of Mr. Hand. The arbitration award, and Judge Brown, in her opinion, holds that there were subsidiary facts sufficient to prove that Mr. Hand did not commit fraud. SKH 2000, the company committed fraud because other employees signed off on draw requests that the court held contained false representations, but Mr. Hand didn't sign them. And the bankruptcy court, I think, rightly found, the arbitrator rightly found, that Mr. Hand did not commit fraud. Well, if Mr. Hand did not commit fraud, then how could he have had any intent to have a defalcation necessary under 523A4? And so that's all the court is left with in the record from the arbitration. The award from the arbitration is actually a finding that both the district court and the bankruptcy court accepted that Mr. Hand did not commit fraud. And so the only way I think that the court could have gotten to a violation of the Texas Construction Act that somehow was a defalcation would have been looking at the Texas Construction Act and saying, well, but he intended to misapply, he intended to divert the funds, and under the definition of intent to defraud, that's intent to defraud, and therefore it's defalcation under 523, but I don't think it can get there under Bullock v. Bank Champaign, which requires the wrongful conduct. But why does not finding fraud necessarily equal no defalcation? I mean, they're in the conjunctive, so, I mean, I hear you saying there was no finding of fraud, but obviously the way that it's set up, it's fraud or defalcation, and, you know, he diverted the funds for personal use, so why? Excellent point. The Bullock court says that defalcation requires an intentional wrong, and I can just kind of rattle off some of these types of examples the Bullock court offered. Conduct that the fiduciary knows is improper, but he wouldn't have known that it was improper to use the funds for another project or for anything else because the Texas Act allows him to. Reckless conduct of a kind that criminal law recognizes, that would clearly, I think, take an embezzlement or an intent to defraud. Conscious disregard or willfully blind to a substantial, unjustifiable risk that his conduct will violate a fiduciary duty. Well, if there's no fiduciary duties imposed by the Act, then his conduct in making the payments would not . . . But if he diverted the funds for personal use when the funds were for construction or business, I mean, how can that not violate a fiduciary duty that runs to the . . . I mean, the mere use of the personal . . . for personal use. You're saying Bullock holds that defalcation cannot occur when it's undisputed that the funds were not used for construction purposes, right? My time is up, but can I respond? Oh, absolutely. The Bullock court dealt with exactly that, where you had the trustee of the actual express trust, the brother, making loans for a personal matter, for another business investment to himself, and the court said that's not enough. That's not the wrongful, the intentional wrongful conduct that is required for defalcation. Okay. We'll see what counsel opposite says. Yes, Your Honor. Thank you. All right. Thank you, sir. You've reserved your rebuttal time. All right. Mr. Carruth. Good morning, Your Honors. Good morning. My name is Jeff Carruth. I represent Saeed Kakashani, who is the plaintiff and creditor in the bankruptcy case and who is the appellee here today. Mr. Kakashani has been at this since 2011, and he doesn't want this to happen to anyone else. The good news is, is that we do have a succinct record of this case, 19 pages of an opinion, and although we shouldn't consider it, we do have that affidavit. But all questions are answered by the arbitration award itself, and that is the order and the agreement between the parties that says all of the facts are going to be decided in the arbitration. That agreed order is attached to the arbitration award, and to specifically talk about it, the parties jointly agree that all issues of fact and law regarding any allegations of breach of contract, fraud in the inducement, fraud by nondisclosure, fraudulent misrepresentation, false statements of financial condition, defecation of breach of fiduciary duty, et cetera and so forth, an attorney's fee shall be determined by the arbitration. And then it continues that although Dr. Kaye has requested that Stephen Hahn be denied a discharge, the parties agree that whether or not Hahn is legally entitled to a discharge or whether a discharge should be denied is a question of law to be decided by the bankruptcy court. The arbitrator will make no findings on that decision. So the parties lock themselves in at arbitration to the extent that the affidavit shouldn't be considered, and everything that we need is in the arbitration award. It was a fully litigated, completely complete record of what happened in this case. The cases that say, well, we can look at something else, those are usually default judgment cases or a case that doesn't have a record. This was a procedure that Hahn asked for after three years of litigation and two years in the bankruptcy case, and that was the procedure that he agreed to was to follow whatever the award said. So even if it's insufficient, I think they're foreclosed on that, but it's not. It is a fully developed, it's just like getting findings of fact and conclusions of law from a magistrate or a bankruptcy judge to the district court, and it's all right there, everything we need in terms of facts. And then, before I get into my part of this, there was the allegation that, or the observation, incorrect, that the award doesn't talk about tracing or use of funds, and the arbitration award did look at that. The facts from page 3 through 6 of the award talk about how funds came in and out, and we have an example on page 8. Jill Fry also testified that in meetings she attended that Stephen Hahn told claimant CPA, Vahid, that the funds claimant paid to SKH approximately $200,000 and went to a failed investment. And we have that specific piece of where the funds went, because Hahn has an admission in the record of the arbitration. So that, the arbitrator did look at that, and a complete tracing is not necessary to arrive at a finding of misuse and attempt to deprive under the Trust Fund Act, and misuse and attempt to deprive are sufficient without all this extra tracing exercise. And so, and I do want to talk about A2 in a minute before, which the appellant did not get into, but since we're talking first about the trust fund statute, the rubric that the court should follow, there's really two issues under the A4 determination. Was there a fiduciary duty that was encompassed under A4, and was Hahn liable under Bullock and its interpretation of A4? And so, this idea that there has to be some sort of prior expressed trust that everybody knows about and signs off on ahead of time, that's a red herring in this case. What we have is, in the Act, is, and this is the Nicholas line of cases, the fiduciary duty is defined as, I'm sorry, the Act creates fiduciary duties encompassed by 523A4 by the Act defines as wrongful. The record is, in the arbitration ward, is clear that Hahn knew of the construction trust fund statute. He knew of its limitations, and he knew that he was running afoul of it. And so, he's also charged with this knowledge that the trust, the lanes that you have to stay in as a contractor, and to protect subcontractors, which is the purpose of the statute, and owners like Kakashani, the guidelines and framework to stay within are with 162.03, I'm sorry, 162.031A, which is a trustee who intentionally or knowingly or with intent to defraud misuses trust funds, has misapplied the trust funds under the statute. And I misapplied, I've left out a lot of the subparts there, I've paraphrased. But it is the 162.031A statute that creates the fiduciary duty, and that's consistent with how this case, from Boyle to Nicholas, to Swore, and to the future, and Pledger, and that's even how there's a 2019 case that we did not pick up in the briefing, Thornhill, by Judge Parker before he retired, 2019 Westlaw 4795601, which applies the Nicholas framework to a trial judgment and ultimately determines that $19,000 was misapplied because of the record that was created by the trial court that was incorporated into the bankruptcy court's findings later. So that $19,000 was misapplied, and 523A4 liability on the part of the debtor who was the contractor was upheld by Judge Parker. So we have, then, this question of, we have the question of what the boundaries are. Then how do we make this work under Bullock? And this court's application of deflecation, it was consistent with Bullock before Bullock, and we talked about that in the brief. And Hahn is liable even under the Bullock standard, and this is an easy call. And if we look at Part B1 of Bullock, there are four types of conduct that constitute deflecation under Bullock. Bad faith, moral turpitude, number three, other immoral conduct, number four, intentional wrongs, and then 4A, according to the opinion, is the intentional wrong itself, and then 4B is recklessness, and then there's two subparts of recklessness, conscious disregard or willful blindness. And so Bullock doesn't require that the conduct actually be fully criminal in nature, and that consideration is in B2 of the opinion. And the B2 of the opinion, which I want to stop and highlight for just a second, and I'm going to read most of it. Deflecation is commonly used, hence as Congress might have understood it, can encompass a breach of an issuery obligation that involves neither conversion nor taking and carrying away another's property nor falsity. So that's the first qualification of what deflecation means after B1 of the opinion. Nor are embezzlement, larceny, and fiduciary fraud simply special cases of deflecation as so defined. The statutory provisions make clear that the first two terms apply outside of the fiduciary context, and deflecation, unlike fraud, may be used to refer to non-fraudulent breaches of fiduciary duty. So, and Justice Stewart, I think you kind of raised that in one of your questions, that fraud and deflecation are separate, and we can have non-fraudulent breaches of fiduciary duty under the deflecation standard in Bullock. So then when Bullock is applied to the Texas Act, Hahn as the trustee is subject to A4 liability in several different ways. The finding of intent to defraud by itself satisfies Bullock. The award was, the parties committed that determination to the award, and the arbitrator found intent to defraud. Now attacking it as application of a definition to the facts, that's basic statutory construction. The arbitrator was entitled to do that, and the court, this court, and all the, this court should recognize that. But the finding of intent to defraud satisfies Bullock all by itself. Fourteen, paragraphs 14, 15, 19, 21, and 22 of the award make clear that Hahn misused trust funds with the intent to deprive the beneficiaries of the proper use of funds. And that's the very definition of intent to defraud under 162.005 Part 1. That definition is a trustee acts with intent to defraud when the trustee retains, uses, disperses, or diverts trust funds, the record's full of that, with intent to deprive the beneficiaries of the trust funds. And the arbitrator made that finding repeatedly. The appellant doesn't challenge the intent to deprive determination, only how it works out through the rest of the statute. But it is clear that intent to deprive plus these other bad acts does arrive at the intent to defraud. And so that part satisfies Bullock. That satisfies the willfulness or the intentional wrong part, the fourth category that's the focus of the opinion. So then we have intent to defraud also because that is a felony criminal statute under 162.32b. It meets, so the fact that we have intent to defraud and it's criminal meets even the harshest application of Bullock. And the intent to defraud was found once again in paragraph 22 of the award. It's also worth noting that there's a lower threshold that might come into play, which is the misdemeanor aspect of this. Any misuse of funds under 32a, any misuse of funds is a violation of 162. So it's not, you don't have to, if you're just looking for criminality as the key for Bullock, simple misuse is enough. But then let's turn to recklessness. So the award talks about knowing conduct. And then we get the misuse, the 005 definition gets us to intent to defraud but we have a lot of other language in the award that talks about knowing conduct. And the district court looks at section 6.02d of the penal code, which ranks conduct. And you have intentional, knowing, and reckless. Well, knowing conduct is higher than reckless. And Bullock tells us that reckless conduct satisfies the deprecation statute under the test for a4. So we have knowing conduct throughout the award and therefore we have recklessness. And in fact in paragraph 21 of the award, Hahn conceded to the arbitrator that he did act recklessly. And then once again the intent to deprive by itself without reaching, and this is a fifth basis of liability in the way Bullock applies. The intent to deprive by itself that is described in paragraph 21 and 22 of the award also satisfies the intentional wrong under Bullock. That's the scope of the defecation by itself that is talked about in B2 of the opinion. That you can have a non-fraudulent defecation that is not perhaps fully criminal, could be criminal, but you have the intent to deprive by itself that satisfies Bullock even if you don't have the intent to defraud. So we have a variety of ways that Bullock actually applies to this case and this is not such a hard determination under a4 after all. Now what I didn't hear anything about was a2, which was the other basis of liability, 523a2 for fraud or false pretenses or false representation. And so that's the part where we heard a little bit about that, but we didn't hear about Barton Werfer. So the bankruptcy court determined that in paragraph 25 through 27, determined that Hahn was liable to Kakashani for false representations because Hahn was the alter ego of SKH. Last month's decision by the Supreme Court in Barton Werfer is dispositive in favor of Apolli on the question of Hahn's liability under 523a2. Under Barton Werfer, the a2 liability may be imputed to a partner or a related party who did not make the fraudulent statement himself. So if we line up the elements of this matter with Barton Werfer, Hahn was the individual the same as the spouse in Barton Werfer. The award is the debt or the judgment that is at issue and the debt was obtained by false representation. That is clear in the award. And frankly, the Barton Werfer, that's the easiest path to affirmance that is before the court today. Justice Barrett provided at least two rationales that are instructive here. Congress framed a2, she says, to focus on an event that occurs without respect to a specific actor and therefore without respect to any actor's intent or culpability. So whether Hahn intended anything or not, he was, the award says he is also liable. The relevant legal context, Justice Barrett continues, is the common law of fraud, which has long maintained that fraud liability is not limited to the wrongdoer. And the award at paragraph 27 is where we get the meat here that says the record evidence is efficient to establish that Hahn should be held personally liable for the misrepresentations of SKH pursuant to a piercing the corporate veil or alter ego theory. So we have the nexus to elements two and three of Barton Werfer in paragraphs 25 through 27 of the award. Hahn need not have made the representations directly himself. Representations through SKH were sufficient with or without the alter ego finding. The award is a final determination on that issue and it cannot be disturbed. Now, there has been some, there's been a lot of briefing in this case about the alter ego theory and whether it applies. And I don't think the court needs to reach that under Barton Werfer to affirm on a2. But the idea that the alter ego doesn't apply is also incorrect in this case. Or alter ego is not a basis of liability under a2. Before Barton Werfer, the crux of the issue was whether Hahn was liable through the application of the alter ego doctrine all by itself. And alter ego was sufficient for the district court. The bankruptcy court and the appellant say no because as they read recover edge, fraud cannot be imputed except in a partnership or principal agent context which they say was absent here. But there's two flaws of that analysis. Recover edge was not an alter ego case. It didn't criticize alter ego liability under a2. In fact at 1296 recover edge itself endorses application of the alter ego doctrine as one path to a2 liability. The rationale of loose, Quinlan and recover edge and advanced by the bankruptcy court and the appellant and the facts of this case deal with, those cases deal with partnership or principal agent situations. They don't negate alter ego. And if we think about alter ego and how it is also an easy path to affirmance, the cases, Quinlan and loose that support imputed liability in the partner, partnership context and the principal agent context. Well that involves A connecting to B. So we're going to connect a principal to an agent, we're going to connect a partner to a partner and we're going to impute liability by the actions of the agent to the principal or one partner to the other partner. Well alter ego doctrine says they're one and the same. You don't, there's no connection. You don't have to run a cord from one to the other. They become one and the same in their merge. And that was the case here. And that's the natural effect and the remedy of any alter ego theory. And that's what the arbitrator found here is that there was no distinction between SKH and Hahn. It was his personal fiefdom. He was paying off old debts, he was running personal expenses through it and it was just simply, it was just, there was simply no separation between the two. So alter ego is an easy application in this case for liability under a2 because it's one, they're one and the same. So I mean it's easier than imputation for principal agent and partnership. Recover edge also doesn't fit this case because obviously the jury found that Carpenter didn't do it. He wasn't, the subject of recover edge wasn't, wasn't guilty of the conspiracy to defraud. Appellant also talks about in the brief that there was no distinction between SKH and Hahn. Hahn was an employee or agent. But that's simply not the case because the record is very clear that Hahn was everything. He was the director, he was the sole shareholder, he was the president. And he ran SKH. So that's not applicable. And then the approach of Barton-Werfer itself would permit alter ego liability. But I don't think you have to get there because of Barton-Werfer. We also talk about, we also throw in a6, not throw in, but we add a6 as a potential grounds of liability. And we would also submit that the conduct in this case does meet the Geiger standard of willful injury, willful malicious injury. The intent to deprive is throughout the opinion. The intent element of Geiger is there. The malicious intent is there. The intent to harm, which is the intent to deprive the rightful beneficiaries of the trust funds. He, Hahn, acted with the intent to deprive. He misused funds. And the injury is inescapable when funds are advanced from Kakashani and used for everything else except on his house. And so for these reasons, we affirm the district court on a2 and a4 and on a6. Thank you. All right. Thank you, sir. Back to you, Mr. Provost. What's your response to the SCOTUS case? To the what, I'm sorry, Your Honor? The Supreme Court case, Barton-Werfer. Opinion from Justice Barrett. Yes, Your Honor. And I pointed this out to the court in my 28-J letter. Barton-Werfer is a case involving a husband and wife. Sold a house. There was a finding of fraud by nondisclosure against the husband. But they were in a partnership. And so the wife was found to be liable as well as a partner. And Barton-Werfer, unfortunately, I believe from the appellant standpoint, has completely changed how Section 523a2 is viewed now. What the Supreme Court has said is that because it is written in the passive voice, you don't look at the actor that committed the wrong, the fraud. You look at the nature of the obligation and whether that obligation arose from fraud. And then whoever is liable on that obligation is, in fact, liable and is not dischargeable. My response to you as to how that impacts Mr. Hann is that there are no subsidiary findings that the arbitrator made as to alter ego. So, number one, Barton-Werfer did not involve alter ego, although certainly if Mr. Hann is liable as an alter ego on the judgment, I believe it's possible that under Barton-Werfer it's non-dischargeable. But there was no subsidiary finding of alter ego. If you look at the arbitrator's award, he makes conclusory statements about that, oh, this was, Mr. Hann was the alter ego of his company. But alter ego, there has to exist such a unity between the corporation and the individual that the corporation ceases to be separate. And holding the corporation liable would promote injustice if only the corporation is held liable. But in this case, even though the arbitrator made these conclusory statements to reflect this holding of the Texas Supreme Court, he didn't say how many payments were made that he always put his money into the corporate account and used it to pay his personal bills. There's absolutely no specific that would support that. Now, the bankruptcy court didn't reach the issue because the bankruptcy court said, well, under RecoverEdge, you can't impute the liability unless it's partnership or it's agency. And so the bankruptcy court didn't get to whether or not there was, in fact, any subsidiary findings that would have supported an alter ego. I don't think the district court did it either. And so I would think that this court, to the extent, I'm sorry, my time's up. You can finish your statement. Thank you, Your Honor. I would think that this court should remand in that event to the bankruptcy court to make determination of whether or not there was an alter ego, that Mr. Hann was an alter ego. Okay. All right. Thank you, counsel. We have your argument in the briefing. Appreciate both counsels. The case will be submitted along with the other cases that we have for today, and we will get it decided as soon as we can. Appreciate it.